## Hurst v. Commonwealth.

Feb. 17, 1939.

J. P. HARRISON for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

The Grand Jury of Wayne county returned an indictment against appellant accusing him of the crime of unlawfully and feloniously cutting down and carrying away timber growing upon the lands of another (W. S. Duncan) of the value of more than $20 and without color of title in himself to the land upon which said timber was growing or to said timber. Apparently the indictment was drawn under Section 1201 of the Kentucky Statutes, which makes the offense set out in the indictment a felony if the timber so taken in the manner and circumstances described in the indictment be of the

value of $20 or more. However, Section 1244 of the Kentucky Statutes, which is a degree of the offense denounced in Section 1201, makes it a misdemeanor only if the timber so taken and carried away in the manner described in the indictment be of the value of less than $20 and as much as $5. The court instructed the jury under both statutes and the jury found appellant guilty under the misdemeanor statute and fixed his fine at $50. He has filed the record with the clerk of this court and prayed an appeal.

The motion and grounds for a new trial consist of the following items: (a) The court erred in refusing to peremptorily instruct the jury to find a verdict of not guilty; (b) the court erred in refusing to instruct the jury that if they believe that the defendant in good faith believed that the land from which the timber was cut belonged to him or his wife they should find him not guilty; (c) the court erred in refusing to give a definition of the word "feloniously" as used in the instructions; (d) the court erred in the instructions given; and (e) the verdict is against both the law and evidence.

It appears that the respective lands owned by appellant or by Mrs. Hurst, his wife, and the prosecuting witness (Duncan) were formerly a part of what is known in that community as the Miller estate and appellant and Duncan acquired adjoining parcels of the Miller land at a sale by the Master Commissioner of the Wayne circuit court in a settlement of the Miller estate. The dividing line between the Hurst lands and the Duncan land constitutes the closing line of the Duncan tract and the beginning line of the Hurst tract. There is a gum tree standing at one end of the line, the identity and location of which is not disputed. The other end of the line near what is known as the Still House Spring is described in the Hurst deed as a stake, and in the Duncan deed as a "cedar knot being placed in the creek bank as a corner." The Hurst deed describes this line as "beginning near the Still House Spring on the creek bank at a stake corner and running N 72½ W 184 poles with W. S. Duncan's lot No. 4 to a gum corner to B. S. Huffaker." The Duncan deed describes the last call as running from a gum "the corner to B. S. Huffaker and Silas Cooper, being the corner to R. P. Hurst (appellant) S 72 E with the line of R. P. Hurst, 184 Poles to the beginning, a cedar knot being placed in the creek bank as a corner." The timber cut

and removed by appellant was located along this division line between the Hurst and Duncan lands. When the Miller land was divided the surveying was done by Cole Coffey, who was assisted by Senator E. Bertram, who marked the lines by certain marks on the timber along the line. It appears that the surveyor and those assisting him could not see from one corner to the other because of timber and it was necessary to make a calculation as to its course, and they considered it as running S 72 E from the gum corner and so described it in the Duncan deed. The Hurst deed reverses this course and for some reason there was written in the survey, "N 72½ W." Mr. Bertram says that he has run the line since that time and that the correct degree is "S 68 E" or N 68 W. It appears that they encountered some difficulty in running the line, and on account of a defect in the compass or of an error in the survey they ran and marked, not the straight line called for in the Duncan deed as running from the Hurst corner S 72 E with the line of Hurst 184 poles to the beginning, but instead, they ran a crooked line. Mr. Bertram indicates in his testimony that part of the marked line is neither on the degree N 68 E, N 72 E nor N 72½ E, and admitted in response to questions that under all the circumstances developed the correct location of the division line involved is a "Chinese puzzle."

Appellant contends that if the line is run straight from the gum corner to the proper point on the creek bank N 72½ E called for in the deed all the timber cut was located on the Hurst (appellant) land, and this fact is not denied. But it is claimed that the marked or crooked line is the correct one and, in this event the timber in question was on the Duncan land.

In reference to the line run when the Miller land was divided, Mr. Bertram testified as follows:

"Q. How does that line run, where is the line between these parties? A. The line called for in the papers really calls for on Duncan's side of the marked line. If you actually run the line regardless of course or distance, if the papers called from one object to another, it would be on Duncan's side, running his line, but if, running according to Hurst, it would be on Hurst's side, you see the gum never was the beginning corner.

"Q. If it was run according to Hurst's, where

would the timber be cut? A. If it was run according to Hurst's, it would be on Duncan.

"Q. Running from the gum? A. No, sir, from the creek to the gum, Duncan's from the gum to the creek.

"Q. His line and Duncan's don't correspond then? A. No sir.

"Q. How much space is in between them? A. I don't know; quite a distance, possibly as much as ten acres of land.

"Q. Who does that land belong to? A. According to the marked line, it belongs to Duncan, according to a straight line, it belongs to Hurst.

"Q. Is this timber cut on that line? A. Yes sir.

"Q. You say according to a straight line from one object to another, it belongs to Hurst? A. Running according to Hurst, it would be on his side.

\* \* \* \* \* \*

"Q. According to the line agreed on when the land was laid off and marked, it belongs to Duncan? A. Yes, sir."

On cross-examination Mr. Bertram stated that they started to run a straight line from the gum to the point called for on the creek, about the mouth of the branch, and at the time he thought the point was to be above the mouth of the spring branch, that Mr. Duncan had said this was where he thought it ought to be, and that he understood the course was to be a straight line, and that he and Mr. Coffey, the surveyor, thought it was to be a straight line, and that all reference to the adjustment of the matter was based on the idea that that was the course the line was to be and admitted that there was an error in the surveying. He further said that the parties (appellant and Duncan) had been coming to see him for some time and trying to get the matter straightened out.

According to appellant's evidence he claimed title to the land and timber taken therefrom because the straight line N 72½ E as claimed by him included it. He was asked if he was present when Senator Bertram ran the line referred to as the crooked or marked line and he said, "I was with him when he tried to run it and

couldn't run it. He started off on the line and ran clear off, running by these marks." He was asked about offering to compromise with Duncan and pay him for the timber and he said that he told Duncan if he had taken any of his timber he would pay him for it, but insisted in that conversation that the line claimed by him was the correct one and he was the owner of the timber. In this he is corroborated by another witness who was present and heard the conversation.

Cole Coffey testified that he did the surveying in the division of the Miller lands and also ran the cross line between Duncan and appellant, and also re-surveyed it since this dispute arose, and according to his evidence he encountered some difficulty in closing the line as claimed by Duncan.

It is clear from the evidence that the line claimed by appellant to be the correct one is the one called for in the division of the Miller estate, and constituted the closing line of the Duncan tract and the beginning line of the Hurst tract, and it is admitted that if this line be the correct one the timber in question was taken from appellant's land. Appellant claiming under this line, it cannot be said that he had no color of title. Whether this line be the correct one we need not determine, since that question is not before us. "Color of title" does not mean title in fact, but appearance of title, (Shutt v. Methodist Episcopal Church, 187 Ky. 350, 218 S. W. 1020), and it cannot be said that the line claimed by appellant did not furnish appearance or "color" of title. It is clear that there was a bona fide dispute between the parties and appellant had reasonable grounds to believe that the line claimed by him was the correct one.

The Commonwealth bases its case upon the theory that the crooked or marked line claimed by Duncan is the correct one. However, it was incumbent upon the Commonwealth to show not only that the line claimed by Duncan is the correct one but also to show that appellant had no reasonable basis for his claim to the timber, or as much as color or appearance of title on which to base his claim. The court instructed the jury to find appellant guilty if he cut and carried away the timber without "color of title" to himself, but did not define or explain to the jury what constituted color of title, nor did it submit to the qury the question of appellant's good faith in believing that the line claimed by him is

the correct one. We do not see how the jury could have found appellant guilty unless it was for the lack of understanding as to what constituted "color of title" and was of the opinion that appellant should actually show title in fact. However, aside from the instructions or the failure of the court to define or explain to the jury the legal term, "color of title," or submit to it the question of whether appellant had grounds to believe and did in good faith believe that he owned the timber, it is our view that the evidence wholly failed to establish that appellant was without color of title to the timber in question, or that he feloniously cut and removed same. The court should have peremptorily instructed the jury to find a verdict for the defendant.

The judgment is reversed and remanded for proceedings consistent with this opinion.